UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
                                                              :
SPECIFIED TESTING LABS, LLC, et al.,   :
                                                              :
                          Plaintiffs,   :
                                                              :          22-cv-1946 (VSB)
             -against-   :
                                                                :               **ORDER**
ELIZABETH DUNN, et al.,   :
                                                              :
                          Defendants.   :
                                                              :
-----------------------------------------------------------X

<u>VERNON S. BRODERICK,</u> United States District Judge:

      I am in receipt of the Proposed Order to Show Cause for a Preliminary Injunction filed by Plaintiffs Specified Testing Labs, LLC ("Specified") and Hydro Technologies, LLC ("Hydro") (together, "Plaintiffs" or "Specified/Hydro"), (Doc. 9), and Plaintiffs' supporting materials, (Docs. 1, 10–12), the materials in opposition filed by Defendants Elizabeth Dunn ("Dunn") and York Analytical Laboratories, Inc. ("York") (together, "Defendants"), (Docs. 29–33), and Plaintiffs' reply materials, (Doc. 35–38.)  In advance of the April 20, 2022 hearing on Plaintiffs' motion for a preliminary injunction, it is hereby:

    ORDERED that the parties be prepared to answer the following questions, among others, at the hearing:

1. On page 14 of Plaintiffs' memorandum of law it states, "Dunn's employment at York, and York's use of Hydro's confidential information and trade secrets that Dunn brought to it, have already caused Hydro economic harm through the loss of customers, and will soon cause irreparable harm unless Dunn is restrained from working there and York is restrained from using such information to its benefit and Hydro's detriment."

    a. Does this mean that as of the date of the filing of Plaintiffs' memorandum of law Plaintiffs had not yet suffered irreparable harm?

    b. Since the filing of Plaintiffs' memorandum of law have Plaintiffs suffered irreparable harm?

    c. What is the irreparable harm Plaintiffs claim they will suffer?

    d. Why did Plaintiffs wait until March 15, 2022 to file the motion for a preliminary injunction if Einwohner learned on December 9, 2021 that Dunn was leaving and if Plaintiffs knew by January 3, 2022 that York had acquired Aqua?

2. On page 3 of Plaintiffs' memorandum of law it states, "Such confidential information and trade secrets include a wide range of know how related to field sampling, unique testing requirements for each particular customer, and specific systems of operation, including a sample collection calendar program to manage public water supply testing schedules, and procedures for Hydro employees to follow in scheduling, sampling, analyzing, and reporting, and in managing laboratory business."

    a. Where are these trade secrets identified in the Complaint?

    b. Where is this confidential information identified in the Complaint?

    c. Is this a complete list of the trade secrets and confidential information Plaintiffs claims are at issue in this litigation?

    d. What does unique testing requirements of customers mean?

        i. Are the unique testing requirements of customers public knowledge?

        ii. Are the unique testing requirements of customers trade secrets or confidential information of the customers?

        iii. How many employees at Specified/Hydro were aware of the unique

    testing requirements of customers at the time of Dunn's departure?

   iv. How, if at all, where the unique testing requirements of customers protected from disclosure by Specified/Hydro?

e. What is the sample collection calendar program?

   i. Is the sample collection calendar program publicly known? Can the public water supply testing schedules be discerned through reference to publicly available information?

   ii. Does the sample collection calendar program utilize proprietary software? If not, in what format is the sample collection calendar program kept?

f. What are the procedures for Specified/Hydro employees to follow in scheduling, sampling, analyzing, and reporting, and in managing laboratory business?

   i. Are these procedures in writing? If not, in what format were they kept?

   ii. At the time of Dunn's departure how many employees had access to these procedures?

   iii. At the time of Dunn's departure how were these procedures safe guarded?

   iv. How are these procedures unique or proprietary?

g. On page 11 of Plaintiffs' memorandum of law, it states, "While some portions of Hydro's confidential information and trade secrets have greater competitive value than others, the totality is more than just the sum of its parts, and gives Hydro its competitive edge over any competitors or newcomers." Do Plaintiffs rely on the assertion that the information only constitutes trade secrets or confidential information when considered together? If so, what legal support is there for the

claim that "the totality is more than just the sum of its parts."

3. Where in the Plaintiffs' memorandum of law is there a discussion of the reasonableness of the 300-mile regional restriction?

    a. Are there cases where a court found a regional restriction of 300 miles reasonable? If so, what type of business was involved in the case? Did the business have a local or nationwide sales area?

    b. At the time Dunn left Specified/Hydro's employ, did Specified/Hydro service customers or have business throughout the 300 mile restriction? Are Specified/Hydro only licensed to do business in Connecticut and New York?

    c. On page 23 of Plaintiffs' memorandum of law, it states that the "fact that Dunn will no longer be able to work in the environmental testing field a short distance from Hydro does not prevent her from other work." Doesn't the 300-mile restriction encompass part of multiple states? Is there case law that supports the notion that the 300-mile restriction is a "short distance"? Should I take into consideration that the restriction forecloses Dunn from practicing in her field of expertise within its boundaries?

4. On page 6 of the Plaintiffs' memorandum of law it states, "The Non-Compete also provides for enforcement of the restrictive covenants through preliminary injunctive relief, and empowers the Court to narrow the scope of the restrictive covenants if it finds them overbroad."

    a. Is there case law approving a court's narrowing the scope of a restrictive covenant if it finds a covenant to be overbroad?

    b. Is there case law saying it is impermissible for a court to narrow the scope of a

restrictive covenant if it finds a covenant to be overbroad?

5. Does Defendant Dunn concede that she lied to Einwohner about where she was going to work? If so, is this indicative of bad faith and how and where would that play into the analysis of whether to grant or deny the motion for a preliminary injunction?

6. Does Specified/Hydro have an internal computer network for its employees?

7. Does Specified/Hydro have its own email system for employees?

8. Is there any evidence in the record that Dunn took Specified/Hydro's confidential information or trade secrets when she left Specified/Hydro's employ? If so, what is that evidence?

9. On page 10 of the Plaintiffs' memorandum of law it states, "Between February 1 and March 11, 2022, Specified/Hydro lost approximately ten percent (10%) of its long-time customers, many advising they were moving their business to York."

   a. In February 2022 how many customers did Specified/Hydro have?

   b. How many customers did Specified/Hydro lose between February 1 and March 11, 2022?

   c. What are the names of the 10% of customers?

   d. How many of the 10% said that they were moving to York? Of those, did any say they were contacted by Dunn about moving their business? If the customers did not indicate they were moving to York, what evidence do Plaintiffs have that these customers went to York, other than Plaintiffs' assertion on page 10 that "[a]s there are no other water-testing laboratories nearby to which these customers could take their business, there is little question that all of them have gone to York"? What evidence do Plaintiffs have that customers only took their business

      to "nearby" laboratories? How many laboratories are in fact "nearby" and how do Plaintiffs define that term?

    e. How many customers moved from Specified/Hydro to York between February 1 and March 11, 2022?

    f. Have any customers moved from Specified/Hydro to York since March 11, 2022? Have any customers left Specified/Hydro for other testing companies?

10. What is the evidence that York is using Specified/Hydro's confidential information?

11. What is the evidence that York is using Specified/Hydro's trade secrets?

12. Does Specified/Hydro agree that "Hydro's licenses and/or certifications were always limited to CT and NYS during Dunn's period of employment with Hydro"? If not, what were the limitations of Hydro's licenses and/or certifications during Dunn's employment?

13. On page 19 of the Plaintiffs' memorandum of law it states, "The systems and protocols that Dunn developed over her 27 years at Hydro and its predecessor, and of which she is intimately familiar, and the specific customer information that she amassed through years of experience with Hydro's many long-time customers is not readily ascertainable."

    a. What are the specific systems and protocols that Dunn developed over 27 years?

    b. At the time of Dunn's departure, how many employees were privy to the systems and protocols that she developed? Of these employees how many had employment agreements with confidentiality restrictions? Of these employees how many were under some other confidentiality restrictions? What were these other confidentiality restrictions?

    c. Are these systems and protocols written down? If so, is there any evidence that Dunn copied these systems and protocols and took them with her when she left

      Specified/Hydro's employ?

    d. What is the specific customer information that Dunn amassed? Is this customer information written down at Specified/Hydro? If so, is there any evidence that Dunn copied the customer information and took them with her when she left Specified/Hydro's employ?

14. On pages 4 to 5 of Dunn's memorandum of law it states "Prior to [the Aqua] acquisition, York had only specialized in testing for environmental professionals in the tri-state area and did not have the analytical capabilities or certifications to test drinking water in the same capacity as Hydro."

    a. What does this mean?

    b. Prior to the acquisition could York provide the same services that Specified/Hydro was providing to its customers? If not, what were the services that York could not provide?

    c. Does this mean that York and Specified/Hydro were not competitors prior to January 3, 2022?

    d. How does the fact that Einwohner refused to renew Dunn's one-year employment contract when it expired on April 11, 2018 and her transition to an "at will" employee affect this analysis?

15. At the time of Dunn's departure from Specified/Hydro how many employees did Specified/Hydro have?

16. At the time of Dunn's departure from Specified/Hydro how many employees had worked at Specified/Hydro longer than Dunn?

17. At the time of Dunn's departure from Specified/Hydro how many employees received a

salary greater than Dunn's salary?

18. What is the evidence in the record that Dunn contacted customers of Specified/Hydro about her leaving Specified/Hydro's employ?

19. What is the evidence in the record that Dunn contacted customers of Specified/Hydro about switching their business to York?

20. What is the evidence in the record that Dunn solicited Jeff Hoyt to work at York?

21. What is the evidence in the record that Dunn solicited Sierra Mayerson to work at York?

22. What is the evidence in the record that Dunn solicited Rebecca Warren to work at York?

23. Did Hoyt, Mayerson, or Warren have employment agreements with Specified/Hydro?

24. Did Hoyt, Mayerson, or Warren have non-compete agreements with Specified/Hydro?

25. Does Hoyt say he was solicited by Dunn to work for York?

26. Does Mayerson say she was solicited by Dunn to work for York?

27. Does Warren say she was solicited by Dunn to work for York?

28. How long did Dunn work with Hoyt?

29. How long did Dunn work with Mayerson?

30. How long did Dunn work with Warren?

31. Were there negotiations between Specified/Hydro and Aqua? If so, was Dunn involved in those negotiations?

32. What evidence do Plaintiffs have that Dunn had any hiring authority at York? If not Dunn, who made the hiring decisions at York?

33. In paragraph 24 of Dunn's declaration she states that her "work as General Manager at York began on November 8, 2021, with [her] compiling lists of prospective clients in the tri-state area." Were any of these "prospective clients" customers of Specified/Hydro?

34. On page 2 of Specified/Hydro's reply memorandum of law it states that Warren, Myerson, and Hoyt "were induced to quit by York's job offers to work under Dunn, and any positive opinion given by Dunn regarding their employment would have encouraged York to make an offer to hire them, that is, to induce them to quit Hydro." Is there case law that supports the argument that giving a "positive opinion" about a former co-worker qualifies as solicitation within the meaning of non-solicitation clauses?

35. Was Dunn involved in the acquisition of Aqua by York?

36. On page 15 of Dunn's memorandum of law, Dunn cites to *Purchasing Associates, Inc. v. Weitz*, 13 N.Y.2d 267 (1963), and states that the sale of a business rationale has been applied to situations where an owner, partner or major stockholder of a business has sold her interest "for an immediate consideration which was, in part, payment for the good will of the business." 13 N.Y.2d 271.

    a. Are there cases that discuss what "major stockholder" means? What level of stock ownership has been found to be major?

    b. Does Dunn's initial role as "President of [Hydro]" factor into the analysis at all?

37. In Dunn's memorandum of law, it states that the cumulative time restraints in the employment agreement and non-competition agreement "constitute up to a 10-year restrictive covenant period consisting of a 5-year post assets sale restrictive period and a 5-year post-employment restrictive period."

    a. Do Plaintiffs agree with that interpretation?

    b. What are the legal implications if the restrictive period is considered between 5 and 10 years?

SO ORDERED.

Dated: April 19, 2022
      New York, New York

_____
Vernon S. Broderick
United States District Judge